U.S. Constitution does not guarantee to Americans the right to enact legislation through a direct process. Citizens of about half the states, however, have reserved to themselves that right under their state constitutions. In normal times, the federal judiciary has no power to dictate to those states the procedures by which they should enact legislation by initiative, and lacking that power in normal times, the federal courts do not gain it in times of crisis, such as the ongoing COVID-19 pandemic. Any other rule would usurp state and local officials' primary responsibility to manage crises. And contrary to these principles, the district court below enjoined two mechanical requirements from Arkansas's laws for initiating legislation. And it did so not on the ground that these requirements are generally unconstitutional, but because it thought COVID-19 had rendered them unconstitutional. This court has many reasons to reverse the district court's judgment, and I'd like to discuss three of them this morning. First... Counsel, before you go there, could you tell us whether on July 3rd the proponents of the initiative submitted at least 75% of the required signatures? Your Honor, I can't tell you that yet, because the Secretary of State's office has just begun to count the signatures. The Secretary of State's office has 30 days to verify those. And during that period, the Secretary's office will determine whether they've hit that 75% threshold. And they're not the only ones who submitted petition signatures on the deadline. There were two other initiatives that were also submitted on the deadline, and the Secretary's office has just begun work to count those signatures. So we don't know today, and we won't know for some time, whether they've hit the 75% signature threshold. Counsel, we won't know whether they're verified, but we would know whether they submitted, at least on the face, enough to keep a live controversy for today's proceeding. Oh, yes, Your Honor. I misunderstood your question, and I do know the answer to that question. I spoke with the Secretary's office, and it sounds like both plaintiffs and the other two initiatives that were submitted turned in just under 100,000 signatures, between 90,000 and 100,000 signatures. So on the face, they're not verified yet, but on the face of the submissions, they have hit the 75% threshold. But as I said, no evidence. So then moving from there to the three reasons I'd like to discuss why I think the district court was wrong to enter the injunction it entered. First off, based on the incorrect conclusion that the First Amendment applies to the procedures by which Arkansas legislates by initiative, the district court applied an incorrect heightened legal standard. Second, because plaintiffs have not identified any official action attributable to Arkansas that allegedly caused their injuries, the district court should not have granted them an ad hoc emergency exemption to Arkansas's otherwise constitutional laws. Third, the issue of the appropriate standard notwithstanding, Arkansas's challenge requirements are constitutional, even under the standard that the district court chose to apply. So first is the issue of whether the First Amendment applies to this case at all. And this court has been clear for at least 20 years that it doesn't. It goes back to Dubrovni v. Moore, where this court said that it's so long as the expression of ideas associated with the circulation of petitions is unregulated, a valid initiative regulation is insufficient to implicate the First Amendment. Counsel, I have a question on that. How does the fact that this is an as-applied challenge affect our analysis of whether the First Amendment is implicated, at least with regard to the in-person signature requirement? Your Honor, I don't think it does affect it, because the question is still whether anyone's speech is being burdened here, and there's no speech that's burdened here. The in-person requirement does not burden anyone's speech, because plaintiffs, even the individual plaintiffs, are free to express themselves in any way in support of redistricting reform as a general matter, or in support of ballot access for this initiative in particular. The in-person requirement and the affidavit requirement, for that matter, are only relevant insofar as plaintiffs wish to successfully initiate legislation. And this court and other courts have made clear that the First Amendment does not guarantee the right to successfully use a legislative process. Counsel, is it your position, then, that the in-person signature requirement does not affect the communication of ideas? Yes, Your Honor, that is our position, that the communication of ideas is not affected by the in-person signature requirement, because even with the in-person signature requirement, plaintiffs are free to express themselves in any way they wish. The in-person signature requirement is relevant only as to the mechanics of the process for initiating legislation, and the First Amendment is not implicated by the mechanics of the process. In other words, the First Amendment does not dictate to Arkansas the mechanics by which plaintiffs must be allowed to trigger a legislative process, which is what's at issue here, and what makes this case different than cases like Buckley, Meyer, and Doe, where we were looking at whether certain speech lost its protection because it was involved in the initiative process. Here, the question is whether Arkansas must, to comply with the First Amendment, accept certain speech as operative for the purposes of the ballot initiative process. And the First Amendment is not triggered solely because these requirements might make their speech less likely to be successful as initiative legislation, and this is something this Court has made clear in its reliance on Judge McConnell's opinion for the en banc Tenth Circuit and Walker. As recently as 2016, Judge Wolman wrote for this Court in McMahon v. Mathis, relying on Walker on this passage that we discuss at length, where the Tenth Circuit distinguishes between the mechanics of the process and the speech that's incidental to the process. And it makes sense here to distinguish between the mechanics and the speech because this is not primarily a process that's a forum for political expression, but it's primarily a legislative procedure. It's an exercise of Arkansas's legislative power that's at issue here. And whether that power is exercised by Arkansans themselves or by their representatives in the General Assembly, the legislative power must be limited to a defined process. And the First Amendment is indifferent to how Arkansas defines the limits of its legislative process. So if this was a facial challenge, I would tend to agree with you. But in this as-applied challenge, doesn't the in-person signature requirement do more than just regulate the mechanics of the process in that it affects the number of persons that the plaintiffs can reach with their message? Your Honor, I don't think that it burdens speech in that way. And I think a helpful point here actually comes from Walker, where it talks about – there's a passage in Walker where the Tenth Circuit talks about the difference between requirements that necessarily limit the audience by burdening expression and those that necessarily make speech less likely to succeed because they make the process more difficult. And I think that that's what's at issue here, is it makes it more difficult for plaintiffs to initiate legislation, but it doesn't make it more difficult for them to speak. They are still free to speak in any way they choose. They can sign a petition. It's just the circulator must be present at the petition signing. Which brings me to another point, that it doesn't burden the signer's speech in any way because the signer's doing what he would be doing otherwise. He's signing a petition that's given to him by the circulator. It applies to the conduct of the circulator in this case, who must be present, physically present, while the signer is signing the petition. And the academic requirement is even one step further removed from the speech at issue in initiative signing because it happens after this interchange between the circulator and the signer has closed. Counsel, I'm a little confused now. Are you saying that the only speech we should care about is the speech of the signer and not the circulator? No, Your Honor. That's not what I'm saying, and that's not what the Supreme Court says. But what I'm saying is that the circulator's speech has finished by the time the circulator is witnessing the signing of the petition. The circulator is not speaking through the petition signer's signature. The person who is signing the petition is speaking through that signature. And the in-person requirement does not burden their ability to sign a petition. The in-person requirement applies only insofar as they wish to initiate legislation. And the First Amendment is indifferent to how Arkansas defines that process. Mr. Wagner, doesn't Doe v. Reed and Meyer v. Grant support the point that Judge Gross was raising, that being that the First Amendment is implicated here? Your Honor, Doe, Meyer, and then also Buckley, which is of a piece with these, certainly say that a state must abide by the First Amendment when it regulates speech incidental to the process. But none of those cases considered the issue of whether the First Amendment dictates to the states the mechanics of that process. The Supreme Court has never constitutionalized the specific procedures by which a state must allow initiated legislation. And that's what's at issue here, is whether Arkansas's procedures for allowing legislation implicate the First Amendment, which we don't think they do. And because the district court held otherwise, we think this court should reverse. But there are other reasons, too, that we think this court should reverse. And one is that the plaintiffs have not identified any official action attributable to Arkansas that has caused their alleged burdens. And this is laid out in most detail in our reply brief at pages seven and eight. Plaintiffs haven't identified any such official action because there is no such official action. Instead, what their claim really is, is that procuring signatures has become harder, largely because of a disease that's beyond the control of the state. The Sixth Circuit dealt with a similar claim in Thompson, and it rejected this claim, or at least discussed this claim. The Sixth Circuit is a little coy with exactly what its reasoning is. It mentions a lot of things, and this is one point it mentions. Two, it says there's a state action problem for the plaintiffs in that case. And we think this court could view it that way or as a standing problem that they haven't shown any injury traceable to Arkansas. But however conceptualized... Counsel, why isn't the alleged injury traceable to Arkansas's laws? Because the plaintiffs do not claim that those laws would be unconstitutional under normal circumstances. What their claim is, is that COVID-19 has rendered them unconstitutional. So their injury is traceable to the pandemic itself and not to Arkansas's laws. And allowing this sort of... You know, they call it an as-applied challenge, but allowing this sort of emergency exemption to otherwise constitutional laws would inject the federal courts into managing states' public health crisis response measures, which is something this court said the federal courts should not be doing a couple months ago in In re Rutledge. And we don't think it's proper to view this as a typical as-applied case because of the pandemic context of this case. In a typical as-applied case, judges ask a static, backwards-looking question. At a given point in time, based on the circumstances that are static, does the law violate the Constitution as applied to those circumstances? But here the question is more fluid than that. It's the question changes on a day-to-day basis. Do the current circumstances caused by COVID-19 happen to render Arkansas law unconstitutional? And the facts relevant to that question, in contrast to a normal as-applied claim, they're not the same today as they were when the lawsuit was filed or when the judgment was entered. And they won't be the same tomorrow or a month from now. And state and local officials are better equipped than federal judges to respond to those sorts of fluid, ongoing crises. And they're especially better equipped to do so in a sensitive context like the election context. Subjecting a state's election procedures to federal court oversight in the middle of a pandemic risks undermining the democratic legitimacy of the electoral outcome. And more than that, this is a ballot initiative case. And ballot initiatives are a legislative process. Judicial deference to state decision-making should be at an apex when considering questions of a state's legislative processes. Those questions are at the heart of what it means to be a sovereign state. Because the district court, instead of following these principles, rewrote Arkansas's election procedures in the middle of a pandemic and in the run-up to an election, this court should reverse the district court's judgment. But even aside from the question of whether the district court applied the correct standard, Arkansas's laws are constitutional under the standard that it chose to apply. First off, the district court overstated the plaintiff's burden here. If you look at the district court's order, it simply says, because of social distancing, this amounts to a severe burden. Plaintiffs raised a number of additional facts in their briefing, but the district court did not rely on any of those facts. The district court simply thought social distancing leads to an undue burden. It didn't discuss options like what the Sixth Circuit laid out in Thompson for safe, socially distanced, in-person petitioning. And plaintiffs themselves have come up with ways to safely petition in person. For instance, for the last two weekends leading up to the deadline, plaintiffs hosted consecutive sign-and-drive events around the state, where they hosted drive-through petitioning services in at least seven different cities around Arkansas. Counsel, is that information in the record? We've cited it in our briefs. The sign-and-drive-ish events came up after the district court's judgment, and we did discuss them in our briefing, and they're from plaintiff's website. But they did come up after the judgment, Your Honor. You're right about that. Counsel, perhaps more pertinent, doesn't Arkansas have some disability accommodations specifically for petition measures? I'm not sure which ones you're referring to, Your Honor. Could you be more specific? It's my understanding that Arkansas has statutory provisions specifically for initiative and referendum petitions that accommodate those with disabilities to enable them to sign petitions. I'm not familiar with those, Your Honor, but we don't think those would change the analysis here. That would be an issue of state law, whether those apply to plaintiffs here. And plaintiffs have not alleged that Arkansas has violated state law in disallowing them from taking advantage of those sorts of procedures. I would think, Counsel, that quite the opposite would affect our severe burden analysis if they had ways to sign the petitions under Arkansas law. In that sense, you're right, Your Honor. If it is a way that they could comply with Arkansas law and sign the petitions, to remain in compliance and sign the petitions in a way that is consistent with social distancing, is consistent with Arkansas law, that would lessen the burden at the severe burden point of the analysis. But beyond their lack of severe burden here, the district court also misapplied this court's tailoring standard in the Anderson verdict context. In the Anderson verdict context, this court has said in Libertarian Party of North Dakota v. Yaeger that it doesn't have to be a perfect fit. As this court said, the mere identification of a less burdensome alternative is not dispositive. That's because, as this court said, election procedures are necessarily arbitrary to some extent. The district court didn't take this into consideration when it considered Arkansas's compelling interest in avoiding petitioning fraud here, and it didn't consider whether Arkansas's compelling interests are substantially outweighed by the plaintiff's alleged burdens. Because of that, we think this court should reverse and remand with instructions to dissolve the injunction and dismiss the complaint. And I'm into my rebuttal time, so I'll rest for now unless there are further questions. Very well. Thank you, Mr. Wagner. The court will hear from Ms. Greenwood. Thank you. May it please the court. There is no compelling reason, indeed there is no rational reason, why Arkansas should require voters to risk illness or death to exercise their First Amendment right to sign or circulate a petition. And I use those words carefully. The right here isn't to successfully get something on the ballot. The right for plaintiffs Gray and Allen is their right to sign the petition, which is protected by the First Amendment from the Supreme Court's case in Doe v. Reed. And the rights for Arkansas voters first and Plaintiff Miller are the rights to circulate the petition. All of these rights have been burdened by the global pandemic. I'd like to address the four issues that opposing counsel went through. So I'll start with the application of the First Amendment. As I mentioned, there is controlling Supreme Court authority, not only in Doe v. Reed that protects the right to sign a petition, but also Meyer and Buckley that make very clear that the right to sign and circulate the petition are protected by the First Amendment. Once the state decides that it's going to allow for the ballot initiative. That was also applied by this circuit in the Institute for Initiative and Referendum case v. Jager, where they applied the Anderson verdict test. In that case, they found that there was a sufficient state interest to justify the burden. Now, opposing counsel has suggested that these witness and notarization requirements are mere mechanics. But that's not how the law looks at these things. It looks at whether speech is burdened or not. So in that regard, I'd like to ask you about the notarization requirement. We haven't talked about that much today. But how does that requirement affect the communication of ideas? Isn't that just between the circulator and the notary? That's right. So in order to ensure that somebody who signs actually has their signature counted, that signature needs to be both witnessed by the circulator and then that circulator's witnessing needs to be notarized. And so it's part of the right to sign for the people signing. The right to circulate is the part where I mean, I guess it's also part of the right to circulate that's being burdened. Because if Plaintiff Miller wanted to circulate and she did want to, but she didn't because of her concern for public health, she would have to both interact with many of the signers as the witness. And then she would also have to interact with the notary exposing more people. So I guess, I guess, counsel, my question is, why isn't that just a mechanical regulation of the process? Because where is the communication of ideas in the notarization process? Well, you are unable to communicate the speech of the person wanting to sign if you don't have it notarized. At the moment, we actually have about a thousand people who signed without a witness before the stay was in place. All of those signatures were submitted as part of the 90-something thousand signatures. They won't count because there wasn't this interaction with the notary and a witness. So their speech would be burdened without Judge Holmes' order being upheld. And this court has explained that in the Dobre-Volny case. I mean, in that case, the court made this exact decision. Ms. Greenwood, back to the notary requirement. Is there any evidence in the record showing that any of these plaintiffs would suffer an injury, in fact, just based on the notary requirement? Yes, Your Honor. So both Plaintiff Gray, Ms. Gray is in a retirement community that is on lockdown. And so she can't interact with a circulator. And then that circulator, because there's no circulator to actually witness her signature, can't go on and get it notarized. And in the case of Mr. Allen, if his wife. Is there anything in either of the circulator's declarations that supports their not wanting to or being unable to interact with a notary? Yes. So Ms. Miller talked about how she had developed a network of 30 volunteers through the League of Women Voters that were intending to circulate. But once they were aware of the COVID crisis, many of them are of an older age and at greater risk or have family members who are. And so they didn't want to interact with either the signers or the notary. It's just another contact that they would have to make and risk exposure. And so in that way, both the signers and the circulators are burdened by that requirement. And as this court said in Dobrovolny, in that case, they didn't know the total number of signatures they needed. And the court said, well, that doesn't burden speech. You go and circulate and get signatures. You just won't know how many you exactly need. They say in no way restricted the ability to circulate petitions. While the Supreme Court in Buckley, when it was striking down the requirement that canvases were identifying badges, said, well, that actually will inhibit communication with voters because it will limit the number of voices to convey the message. And that's what's happening here. We have limited the number of voices that can convey the message. Those volunteers that Ms. Miller initially engaged weren't able to go out because of the pandemic. And this gets into the question that was raised about official action. This is exactly what happens in As Applied Challenges. We don't need it to be the government's fault in order to bring a case. So Mr. Griffin, who was too poor to get a transcript, the government didn't make him poor, but it was in Griffin v. Illinois. They couldn't impose the requirement that you pay for a transcript given that he was poor. In the Buckley v. Vallejo example, the government says we require disclosures. And in the later As Applied case of Brown v. Socialist Workers Party, the Supreme Court said, right, the Socialist Workers Party has experienced harassment. It's not the government harassing them, but because of that harassment, the government can't continue to impose the disclosure requirement. So that's what we're talking about here. Given the pandemic that's going on and causing the burdens, the government can't continue to enforce the witness and notarization requirements. And that's why Judge Holmes' remedy was very narrow and specifically looked at the witness and notarization as the burden, given that in-person interaction is the problem here. We all need to social distance, according to the CDC and the Arkansas Department of Health. And yet with the other requirements, Judge Holmes said, well, I don't think they burdened speech, you know, getting 90,000 signatures. If they required more, that's more speech. Right. Moving to the oh, I should also mention with respect to official action that the Sixth Circuit decision in Thompson was specific to the facts in that case where there was specific First Amendment carve outs in the state orders. The Sixth Circuit in July 3 upheld an extension of the deadline for a ballot initiative in the SOWARI media case. And I'm happy to later provide that citation to you. And so it really, as happens in all Anderson verdict cases, it is a fact intensive inquiry. You need to look at what are the specific burdens here and what are the specific state interests. And if I can turn to that here, this is exactly the type of test, as I mentioned, that was applied in the Eighth Circuit in the IRIB Jager case. Judge Holmes found the plaintiffs were severely burdened. And then he also looked to the question of fraud. Now, there was not a dot of evidence as to fraud in the record, but Judge Holmes said that there are cases that have said that there is a fraud interest. And so he assumed that it was a compelling interest for the state to prevent fraud. And he looked at was that the witness and notarization requirements, are they narrowly tailored? And he said no. Now, I'll note first that, as Justice Thomas said in Doe v. Reed, the fraud interest at the balloting stage, at the actual voting stage, is higher than it is at the initiative stage. I have a question in that regard. With regard to the determination of the severity of the burden, the secretary's brief notes that at least they argued that the signer and the circulator could communicate at a safe distance or perhaps through a window. And as I've noted, I believe Arkansas also has some disability accommodation statutory provisions for petition signing. Why wouldn't that ease the burden on the plaintiffs? Yeah, the problem here is that at some point there has to be an exchange of a piece of paper. So the way that the drive-through signatures went, it wasn't like normal where you go to someone with a clipboard and they sign. That process was burdened to the extent that they had single-wrapped pens and lots of hand sanitizer and people stayed in their cars and everyone wore masks. And so it was possible to pass the paper back and forth. But if you're someone like Mr. Allen, who's immunocompromised, his doctor told him he couldn't do that. And so even though you can go and see your family through a window, you can't actually sign a petition through a window because at some point that piece of paper needs to change hands. And so that's why that's a very specific burden, the witnessing and the notarization requirements. And this also raises the question that the letter to the court that Mr. Wagner provided about the Alabama case, where obviously you know that if it's just a stay, it's not a merits decision, so it doesn't have precedential value. But I do think it's relevant to mention three other reasons why that Alabama case is different than the case in Arkansas. So the first thing is, of course, the Purcell principle in Alabama. They're on the eve of a primary election and the Supreme Court stayed. The judge is getting involved at the last minute. But then there's two other reasons as well. With respect to the fraud, as I mentioned, the fraud interest for voting as opposed to ballot initiative signing is higher. So it was a higher state interest. And then on the burden level, the burden there was lower. You just needed to have two witnesses, anybody, any registered voter in the state can sign. In this case, you need a specifically a canvasser to sign. And not everybody is a canvasser. In order to be one, you either have to be paid and have a background check done with the state, or you have to get a specific piece of paper that's provided by the secretary of state, double sided and so on, that the campaign provides to you. And so and then once you've done that, you then have to go and get a notarization. So that there was a greater burden in this case than in Alabama, as well as a lesser state interest. And that's why we feel that Judge Holmes's decision was an appropriate balancing of the fraud interest and the burden. I will move on to what Mr. Wadner discussed with respect to this being an as applied challenge. He talked about the In re Rutledge case. So that case was a different posture. In that case, the state had issued a specific order. And the question was, could they issue that restriction? Given all of the issues going on in public health here, the secretary of state actually can't choose to not enforce the witness requirement of his own volition. He's the secretary of state. He has to follow the order. And the Constitution requires the witness and notarization. And so in this case, the federal bench is exactly where we need to go in order to seek relief for our plaintiffs. And the final issue I want to deal with is this question of judicial authority. In this case, Judge Holmes respected state sovereignty from the secretary of state's position. They have received these 90 something thousand signatures. We know that if the state remains in place, then they're going to strike all of those signatures that were unwitnessed. But, you know, they'll strike others for people who weren't registered to vote, for example. From the plaintiff's side, it gave the ability for someone like Miss Gray to actually sign and support this petition. It meant that the campaign could send out to the thousands of people that requested the form that wouldn't be witnessed. It could send them out and have people sign in their homes and mail it back with no actual having to touch someone else's piece of paper. So was there a new form developed by the court? That's right. So the court listed in its judgment the same form, but replaced the witness and notarization requirement with what is listed in Arkansas state statutes as a declaration. So a declaration is signed under penalty of perjury. That form was actually provided to the secretary of state in the normal course. The secretary of state approved that form, as they did with the witness form, and then that was used by the campaign until the stay was put in place. Counsel, is there any authority that you can cite to the court that would authorize a district court to create a form like that? Yes, Your Honor. So in this case, once the judge has found liability, if there are multiple ways that the state could remedy that liability, then the court would need to defer to the state. So that's the Republican Party of Arkansas v. Faulkner case where there were two options and the state was allowed to choose between them. In this case, there was just one way. It was make a declaration instead of having a witness. And so the court, to be very clear, laid it out. And I'll also note that the court asked both parties if they would change anything, if there were any problems with what he was doing, and neither party objected to anything about the judgment. We all agreed. And then we also all agreed to convert the preliminary injunction finding into a permanent injunction. So in this case, the important things to remember are that which rights are at issue, that we are talking about a right to sign and a right to circulate. It's not about access to the ballot. It's not about success at the ballot or anything like that. And the other thing is that the Anderson verdict test can handle these types of factual determinations. Once you've determined the level of burden, and in this case it was found to be severe, unless you find that to be an abuse of discretion or clearly erroneous, then you balance that against a compelling state interest and decide if that compelling state interest is narrowly tailored to that fraud. And so just a reminder that with respect to the rights, the right to sign is a First Amendment right that receives exacting scrutiny. That's what the Supreme Court said in Doe v. Reed. And the Anderson verdict test applies to the right to circulate petitions and receives the Anderson verdict test. Now, in this case, they essentially meld because the judge found that the burden was severe. Then we're talking about exacting scrutiny in both places. I guess the other thing I would say is if you don't apply the Anderson verdict test, then you're just left with First Amendment exacting scrutiny. There's sort of no case law anywhere that says we would ever apply rational basis when we're talking about a First Amendment right. Counsel, I do have a question, if I could, in your remaining time, about the scope of the injunctive relief that was granted. Given that this is an as-applied challenge, should any injunction extend beyond the parties to the litigation? Yes, Your Honor. So this court has found, as we cited in our briefs, Rogers v. Bryant, that you don't get as-applied relief simply for the plaintiffs that request, but plaintiffs that are similarly situated. And so, obviously, that is in your discretion in what you do. But there is authority from the Eighth Circuit for this court to say, well, you know, Mr. Allen and Ms. Gray are not the only people that are not interacting with witnesses. And so for all of those people, they should have a way to be able to express their First Amendment right to sign. And similarly, there's all those League of Women Voters volunteers that would love to email out a copy of the form. Then people can print it and sign it and send it in. They can be circulators, but not if they have to actually interact in person. And as you know, in Crawford, there were six votes for as-applied challenges. So we think that that's perfectly within your rights. At this point, there have now been over 300 deaths from COVID in Arkansas and nearly 25,000 people have contracted the disease. And sadly, things are only getting worse. Without the relief from the district court, Ms. Gray and Mr. Allen's unwitnessed signatures will not be counted. Ms. Miller and multiple volunteers in this state will not be able to circulate petitions. We ask that you affirm Judge Holmes' opinion and protect the plaintiff's First Amendment rights. Are there any other questions? Hearing none, thank you, Ms. Greenwood. Mr. Wagner, you have some rebuttal time. I think your microphone has been muted. Sorry about that, Your Honor. Very well. I have two points I'd like to focus on in rebuttal. The first about the nature of the First Amendment right here and then about the substantive Anderson verdict analysis that the district court engaged in. So first, regarding the First Amendment, plaintiff's response here makes clear that what they're claiming is a legal right to effective speech. In other words, they're saying that the First Amendment guarantees them the right to speak with a legal effect. But that's not the holding of Doe, Buckley or Meyer. And that's not any holding this court has ever reached. And it's contrary to the 10th Circuit's discussion in Walker. And because there's no speech burdened, it's contrary to this court's holding in Dubrovni. And I point this court back to Nevada Ethics Commission versus Kerrigan, where the Supreme Court said that the First Amendment does not guarantee the right to express oneself using the mechanics of a governmental procedure. And that's the right that they're claiming here. There is no right to successfully initiate legislation. Petition circulating petition signing are protected insofar as they involve expression. But plaintiffs have not identified whose expression is burdened or how it's burdened here. Moving on to the substantive Anderson verdict issues. I'll take this a little bit backwards with the Arkansas anti-fraud interest. I first point this court to the second half of Doe versus Reed, where after the Supreme Court determined that there was a First Amendment right implicated in that case, it spoke very highly of the state's anti-fraud interest in the petitioning process. So I think the district court and plaintiffs are incorrect to undervalue Arkansas's anti-fraud interest here. These are century old requirements. There may not be any evidence of fraud because they've been in effect for so long. So it's unclear what would happen without them. And finally, about the burden. The point I'd like to highlight the most is that plaintiffs and two other ballot initiatives were submitted with nearly 100,000 signatures, despite this court's administrative stay of the district court's order. We think that seriously undermines their claim of a severe burden here. And to say otherwise, the plaintiffs point primarily to the individual plaintiffs and their unique burdens, which is this court just asked my friend in opposition about in her presentation. If that's the case, then the district court's injunction is clearly overbroad, and this court should remand with instructions that it be dissolved. Thank you.  Thank you, counsel. We appreciate your appearance and briefing and arguments before us today. The case will be submitted and decided in due course, hopefully as soon as we possibly can. So thank you for your participation. Ms. McKee, does that complete our docket for the day? Yes, it does, your honor. In that case, the court will be in recess until further call of the court. Thank you. Thank you.